EL PUEBLO DE PUERTO RICO, apelado, *v.* ELÍAS NAJUL
BÁEZ y RAFAEL RODRÍGUEZ RIVERA, acusados y ape-
lantes.

*Número:* CR-80-37     *Resuelto:* 26 de junio de 1981

*Baltasar Quiñones Elías, Yamil Galib Frangie, Santiago Polanco Abreu* y *José Luis Purcell Terrón*, abogados de los apelantes; *Héctor A. Colón Cruz, Procurador General* y *Lorraine Riefkohl, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El Dr. Elías Najul Báez y el policía Rafael Rodríguez fueron declarados culpables, en juicio por jurado, de cometer el delito de aborto en la persona de Myrna Esther Moya, quien estaba en su primer trimestre de embarazo como consecuencia de relaciones extramaritales con dicho policía. La prueba demuestra que el médico no hizo una previa indicación terapéutica sobre la necesidad y conveniencia del aborto desde el punto de vista de la mujer embarazada, ni previa consulta con ella. Bajo tales circunstancias, el aborto es ilegal y procede la confirmación de las sentencias.

El testimonio de Myrna Esther, no controvertido por los apelantes, demostró que el policía Rodríguez, padre de la criatura que ella cargaba, la llevó a las oficinas del Dr. Najul a eso de las 10:00 de la mañana del 5 de marzo de 1979, donde fue atendida por una enfermera adscrita al consultorio de dicho médico. Relató lo siguiente:

> Que antes de pasar donde el Dr. Najul ni la enfermera ni nadie le hizo reconocimiento físico alguno, no le tomó la temperatura, ni la presión, ni ninguna otra prueba. No le preguntó nada sobre su historial médico, ni le preguntó si padecía de alguna enfermedad, ni le llenó ningún récord médico.
>
> Que cuando entró donde estaba el Dr. Najul éste tampoco le hizo ningún reconocimiento sobre su cuerpo, que no le tomó la presión ni la temperatura ni le chequeó el corazón, que no le llenó ningún historial médico, que no le preguntó si padecía de alguna enfermedad como diabetes, corazón [*sic*] reumatismo ni ninguna otra. Que ni el doctor ni la

enfermera ni ninguna otra persona en la oficina le hizo ningún reconocimiento físico a ella. Declaró que cuando fue a la oficina del Dr. Najul se encontraba perfectamente bien de salud, que no sangraba, que no tenía ningún problema con su embarazo, que no tenía dolores ni padecía de ninguna condición anormal.

Que una vez dentro de la oficina la enfermera la mandó a que se quitara la ropa interior y le dijo que se acostara en una camilla que parecía como una burra de las que usan en el hospital para que las mujeres den a luz. Que ella en dos ocasiones se levantó de la burra llorando porque no quería hacerse el aborto. Que en la segunda vez el Dr. Najul dijo: "Bueno yo no puedo hacer nada si ella no quiere." Entonces Rafael Rodríguez dijo que ella tenía que dejarse hacer el aborto porque eso le traía problemas a él. Que él le comentó que cuando saliera de los problemas le iba a buscar una casa y se recogía con ella y podrían tener los hijos que quisieran. Que luego pasó de nuevo a la oficina y la enfermera la acostó en la burra, le puso unos sacos verdes en las piernas, le tiró una sábana blanca por encima (región abdominal) se fue por la parte de atrás y le puso una sábana en la boca para que no gritara. Que cuando ella estaba gritando la enfermera le decía que no gritara porque la gente se iba a dar cuenta de lo que estaban haciendo allí.

Que el Dr. Najul le metió unas pinzas y unas paletas por la vagina y comenzó a halarle, que parecía que le estaba arrancando la matriz y todo para afuera. Que él cogió la paleta y le enseñó lo que estaba sacando, que el feto que sacó se parecía como un ratoncito cuando es recién nacido, sin pelo y sin forma. Que cuando él le enseñó el feto que tenía en las pinzas ella se desmayó, perdió el conocimiento y cuando despertó estaba en una cama en la parte de atrás. Que luego salió de allí, fue al baño y se dio cuenta que estaba sangrando por la vagina. Luego fue donde Rafael Rodríguez, quien le preguntó si ya había terminado, a lo que ella contestó que sí; y éste le dio los $225.00 para el doctor. Que le entregó los $225.00 al doctor y éste le entregó una receta que Rafael Rodríguez compró en una farmacia que queda cerca de la oficina del médico. Que luego de comprar la receta en la farmacia y mientras iban de camino, Rafael Rodríguez le dijo que si algo pasaba que di-

jera que había sido una caída la que le había provocado el aborto. (E.N.P., págs. 4-5.)

Posteriormente ella relató lo ocurrido a un agente del Negociado de Investigaciones Criminales (NIC) y se formularon las acusaciones correspondientes.

Los recurrentes argumentan en apelación los siguientes alegados errores:

(1) Que el Art. 91 del Código Penal, 33 L.P.R.A. sec. 4010, es inconstitucional.

(2) En la alternativa, que aun siendo el estatuto constitucional, en este caso no se puede sostener la convicción de los acusados, por haberse practicado el aborto por un médico autorizado a ejercer la profesión en Puerto Rico con el consentimiento de la mujer embarazada.

(3) Negarse el juez de instancia a transmitir al jurado instrucciones que fueron solicitadas oportunamente.

(4) Permitir, por sobre la objeción de la defensa, que el fiscal, en el curso de su informe, leyera el Art. 91 del Código Penal al jurado y les instruyera sobre los términos allí empleados y los principios de Derecho que según él eran aplicables al caso.

El primer apuntamiento se rige por *Pueblo* v. *Duarte Mendoza*, 109 D.P.R. 596 (1980), en que decidimos la validez constitucional del Art. 91 del Código Penal. Vamos al segundo.

El Art. 91 del Código Penal a la fecha de los hechos disponía:

> Toda persona que permita, indique, aconseje, induzca o practique un aborto, toda persona que proporcionare, facilitare, administrare, prescribiere o hiciere tomar a una mujer embarazada cualquier medicina, droga, o sustancia o que utilizare o empleare cualquier instrumento u otro medio con intención de hacerla abortar, y toda persona que ayudare a la comisión de cualquiera de dichos actos, salvo indicación terapéutica hecha por médico debidamente autorizado a ejercer la medicina en Puerto Rico, con vista a la conservación de la salud o vida de la madre, será sancionada con

pena de reclusión por un término mínimo de dos años y máximo de cinco años. (¹)

■ Dicho artículo prohíbe que un médico intente un aborto sin una previa determinación terapéutica sobre su conveniencia para la conservación de la salud o vida de la embarazada. *Pueblo* v. *Duarte*, supra.

Alegan los apelantes durante el primer trimestre de embarazo el derecho de "privacidad" (²) de la mujer es absoluto y que el Estado no puede intervenir con esa prerrogativa de la mujer durante ese período. Invocan *Roe* v. *Wade*, 410 U.S. 113 (1973). Aparte de que la prueba no estableció que aquí la mujer embarazada hiciera uso de prerrogativa alguna suya, los apelantes parten de una premisa falsa, pues nuestro estatuto no limita esa prerrogativa, ni viola las normas establecidas en *Roe*. Allí se estableció:

> Por otro lado, esto significa que, durante el período del embarazo que antecede a este punto "crítico" (*compelling point*), el médico, en consulta con su paciente, está en libertad para determinar, sin intervención del Estado, a base de un juicio médico, que el embarazo de la paciente debe ser terminado. Si se llega a esa decisión, puede cumplimentarse el juicio médico mediante un aborto, libre de intervención por el Estado. . . .
>
> (a) Durante la etapa anterior a aproximadamente la terminación del primer trimestre, la decisión de hacer el aborto y la intervención para efectuarlo deben dejarse al criterio profesional del médico que atiende a la mujer embarazada. Págs. 163, 164.

Se reafirma la necesidad de consulta del médico con su paciente al llevarse a cabo un aborto en el caso de *Colautti* v. *Franklin*, 439 U.S. 379, 387 (1979), al disponerse:

---

(¹) La Ley Núm. 101 de 4 de junio de 1980 enmendó, entre otros, este artículo para establecer una pena fija de tres (3) años; de mediar circunstancias agravantes, pena fija hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, pena fija hasta un mínimo de dos (2) años.

(²) El término correcto debe ser "intimidad".

En *Roe* repetidamente se dio énfasis al papel del médico, tanto en cuanto a consultar a la mujer sobre si debe o no hacerse un aborto como en cuanto a determinar la manera de efectuarlo. Indicamos que hasta el punto en que importantes intereses apremiantes del Estado proveen obligada justificación para intervenir, "la decisión sobre el aborto es, en todos sus aspectos, inherente y primariamente una decisión médica", [*Roe*, supra,] pág. 166, y añadimos que, si se abusare de este privilegio, "estarán disponibles los correspondientes remedios judiciales e intraprofesionales". *Ibid.*

Nuestro estatuto sólo exige lo que el propio Tribunal Supremo federal ha establecido, a saber, que un aborto durante el primer trimestre requiere una determinación médica de su necesidad. De una lectura de lo ocurrido en las oficinas del Dr. Najul surge palmariamente la falta de consulta del médico con su paciente sobre la necesidad terapéutica de realizar el aborto. No es necesario expresarnos sobre el derecho de una mujer a tener un aborto durante el primer trimestre de embarazo. Basta señalar que un médico no puede escapar a la responsabilidad penal del Art. 91 del Código Penal al realizar un aborto sin hacer una determinación terapéutica previa de su necesidad y, tras informar de ello a su paciente, obtener su cabal consentimiento (*informed consent*). La mera aseveración de la paciente de que ella quiere hacerse un aborto no es suficiente para que el médico pueda liberarse de responsabilidad penal.

Teniendo el aborto consecuencias físicas y emocionales en la paciente y pudiendo su consentimiento estar viciado por presiones externas que anulen su verdadero sentir sobre la operación a llevarse a cabo, es la responsabilidad del médico inquirir e informar a su paciente de las consecuencias del aborto. Solo mediante este diálogo entre el médico y la paciente es que se establece el verdadero consentimiento de la mujer para la realización del mismo.

Los hechos de este caso demuestran que la paciente, si prestó su consentimiento, lo hizo obligada por las presiones

del policía Rodríguez. De ello pudo darse perfecta cuenta el médico, y es obvio que así fue, pues por dos ocasiones la mujer protestó, al extremo de que el médico expresó que no podía hacer nada si ella no quería. La intromisión inmediata del policía Rodríguez para que ella se dejara hacer el aborto no pasó desapercibida para el médico.

En cuanto al tercer señalamiento de error, plantean los apelantes que debió darse la siguiente instrucción especial al jurado:

> Aún cuando Uds. concluyeran por el resultado de la prueba y más allá de duda razonable que a la fecha de los hechos alegados en la acusación Myrna Moya Pérez estaba embarazada y que los aquí acusados le produjeron un aborto; pero que a esa fecha ella tenía menos de tres meses de embarazo y prestó su consentimiento para ese aborto, o si tuvieran duda razonable de ello, entonces Uds. vendrían obligados también a rendir un veredicto absolutorio.

■■■ No tienen razón. La propuesta instrucción no hace mención alguna del requisito de determinación terapéutica que requiere el Art. 91 del Código Penal. La instrucción alterna propuesta para el caso de no impartirse la preinserta, no nos pone en condiciones para determinar si la omisión perjudicó a los acusados, pues no obran en autos las instrucciones impartidas por el juez de instancia. Competía a ellos demostrar en apelación que el tribunal apelado no actuó correctamente. *Pueblo* v. *Prieto Maysonet*, 103 D.P.R. 102 (1974).

■ El cuarto y último apuntamiento de error carece de méritos. Aunque no nos parece buena práctica que el fiscal lea al jurado y dé su interpretación de determinada disposición de ley, él tiene derecho a hacer sus propias deducciones e inferencias sobre la prueba, en consideración del Derecho aplicable. Véase *Pueblo* v. *Ortiz Rodríguez*, 103 D.P.R. 368 (1975) y *Pueblo* v. *Rivera*, 98 D.P.R. 163 (1969). Es de presumirse, en ausencia de alegación en contrario, que al impartir sus instrucciones al jurado el juez cubrió

los aspectos del estatuto aplicable y advirtió, además, sobre el alcance de los argumentos del fiscal. Véase el manual de *Instrucciones al Jurado para el Tribunal Superior de Puerto Rico*, publicación del Colegio de Abogados, 1976, pág. 6.

Atendidos los razonamientos aquí expuestos, *se confirmarán las sentencias apeladas.*

El Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Torres Rigual y Negrón García concurren con el resultado.